PANDUIT CORP., Appellee,

v.

ALL STATES PLASTIC MANUFACTUR-
ING CO., INC., Appellant.

Appeal No. 84–569.

United States Court of Appeals,
Federal Circuit.

Sept. 25, 1984.

Charles A. Laff, Chicago, Ill., argued for appellant. With him on the brief was Martin L. Stern, Chicago, Ill.

Charles F. Pigott, Jr., Chicago, Ill., argued for appellee. Charles R. Wentzel, Tinley Park, Ill., of counsel.

Before KASHIWA, MILLER and NIES, Circuit Judges.

PER CURIAM.

This is an appeal from an order of the United States District Court for the Northern District of Illinois (No. 76 C 4012), entered by Judge Grady on September 16, 1983. The district court disqualified Robert Conte and the firm of Laff, Whitesel, Conte & Saret (the "Laff Firm") from representing appellant, All States Plastic Manufacturing Co., Inc. ("All States"). We reverse-in-part, vacate-in-part, and remand.

### Background

The Laff Firm has been patent counsel for All States since prior to the inception of the instant case in late 1976. The instant suit involves the alleged infringement by All States of Panduit Corporation's ("Panduit") U.S. Patent Nos. 3,537,146 (the '146 patent) and 3,660,869 (the '869 patent). The claimed inventions relate to one-piece cable ties. These self-locking devices, molded from nylon, are designed to encircle and hold together a bundle of electrical wires or similar items.

Shortly before the filing of the instant suit, Bowthorpe-Hellermann, Ltd. ("Bowthorpe"), a British company that manufac-

tures and markets one-piece cable ties, filed suit against All States, charging infringement of its U.S. Patent No. 3,486,201.[1] Since the Bowthorpe lawsuit, also filed in the Northern District of Illinois, involves similar issues, all parties involved in these two lawsuits agreed to conduct joint discovery. The joint discovery has resulted in approximately 13 depositions and All States has received over 5,000 documents in each case. The joint discovery has been stayed pending the outcome of this appeal.

In addition, All States filed a counterclaim in the instant case in mid-1978, alleging that Panduit had conspired with Bowthorpe and Bowthorpe's wholly-owned U.S. subsidiary, Tyton Corporation, to compete unfairly in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Discovery on the counterclaim has been stayed pending resolution of the patent infringement issues. The Laff Firm is also representing All States in the Bowthorpe lawsuit. In addition, Judge Grady is presiding over both cases.[2]

In July 1981, Panduit filed a motion to disqualify the Laff Firm. The motion is based on an alleged conflict of interest created by the merger on July 1, 1981, of the law firm of Robert F.I. Conte Ltd. with the Laff Firm, which brought Robert Conte into the firm. From 1965 to 1975, Conte was an attorney with Ladas & Parry in its Chicago office, working under an employment contract during the entire period. He became a "special partner" in 1972, which entitled him to certain perquisites, such as membership in the Union League Club of Chicago, but he did not share in the equity or management of the firm. Ladas & Parry specializes in international patent work and, at that time, also had offices in New York, Los Angeles, Paris, and London.

During 1969–1975, the Chicago office of Ladas & Parry was retained by Panduit's counsel, David Vogel of Prangley, Dith-

mar, Vogel, Sandler & Stotland, to handle Panduit's foreign patent work. The Panduit work amounted to several hundred thousand dollars for which Vogel was billed.

Prior to June 1, 1971, Ladas & Parry was not a law firm, but rather was a service organization for lawyers, doing business under the name Langner, Parry, Card and Langner. The firm, before and after 1971, prepared, filed, and prosecuted foreign patent applications through foreign associates. During the period 1969–1975, the firm filed approximately 170 Panduit applications, counterparts of seven U.S. applications; 29 counterparts of the '146 patent and 23 of the '869 patent.

In addition, Ladas & Parry was involved in *inter partes* patent proceedings between Panduit and Bowthorpe or a company related to Bowthorpe, such as patent oppositions where the validity of certain of Panduit's foreign patent applications was contested. In the period 1969–1975, Panduit and Bowthorpe were involved in 17 adversarial patent proceedings overseas, at least a few of which were patent opposition proceedings involving counterparts of the subject patents.

Mr. John Chrystal, presently the senior partner in the Ladas & Parry Chicago office, has at all times been in charge of its work for Panduit. The firm continues to maintain foreign Panduit patent registrations, work which is not considered to involve any Panduit confidences. In the critical period prior to 1975, Chrystal was assisted on the Panduit matters by two other attorneys, Thomas Peterson and Richard Streit. Since Conte's technical expertise was in chemical engineering, his work at Ladas & Parry primarily involved matters in the chemical field. While with Ladas & Parry, Conte was never assigned to or worked on any Panduit matters, never re-

---

1. *Bowthorpe-Hellermann, Ltd. v. All States Plastic Mfg. Co.,* No. 76 C 3574 (N.D. Ill. filed 1976).

2. In late 1978, Panduit filed suit against Dennison Manufacturing Co., Inc., alleging infringement of the '146 and '869 patents. *Panduit*

*Corp. v. Dennison Mfg. Co.,* No. 78 C 4993 (N.D. Ill. filed Dec. 14, 1978). This case has also been assigned to Judge Grady and has been consolidated for trial with the instant case on the patent validity issue.

viewed or studied any Panduit files or documents, and never met with any Panduit personnel. Nor is it asserted that he was ever consulted informally on any Panduit matter.

When Conte left Ladas & Parry to form the firm of Kolar & Conte in 1976, he took substantial business with him, and he sued under his employment contract for moneys due, resulting in a settlement. In 1980 he organized the firm of Robert F.I. Conte Ltd., and, in July, 1981, he merged that practice with the Laff Firm.

Though the present litigation was filed in 1976, discovery was still being carried on in 1981. On June 18, 1981, All States served a subpoena on Ladas & Parry seeking all files maintained on behalf of Panduit. On July 10, 1981, All States took the deposition of Richard Streit, a Ladas & Parry partner, in connection with these documents. Conte attended the Streit deposition with Charles Laff. No charge was made for his services because two others of the firm were attending. He attended, he states, to gain experience in such litigation techniques. Subsequently, Panduit's counsel was informed by telephone that Conte was coming over to inspect the 170 Ladas & Parry files which had been produced at the Streit deposition. Conte testified he suggested that he make the inspection because he was familiar with Ladas & Parry's filing system and could more quickly identify files that might contain more than routine matters. Having learned in the interim that Conte had been with Ladas & Parry during the period when that firm had been actively handling Panduit matters, Panduit's counsel refused to permit Conte to inspect the files. In response to this objection, Mr. Laff informed Panduit's counsel that Conte would no longer be involved in the case, and he has not been, except for preparing affidavits in connection with this motion. All States asserts he has been "screened" since that time. On July 27, 1981, Panduit filed a motion to disqualify the Laff Firm from further representation of All States.

### District Court Proceeding

The district court initially determined that the matters handled by Ladas & Parry were substantially related to the present litigation. In an order dated November 16, 1982, the district court stated its preliminary impression that upon finding substantial relatedness, disqualification was required if only because of the appearance of impropriety. However, in light of the more recent Seventh Circuit decisions discussed *infra*, the court concluded that that ground was insufficient; that the court had to make a finding as to whether Conte had actual knowledge; that actual knowledge was presumed from the substantial relationship; and that All States had the burden of proving, clearly and effectively, that Conte had received no confidences. As a result, an evidentiary hearing was held for this purpose.

To show that Conte acquired Panduit confidences at Ladas & Parry, Chrystal testified that he, Conte, and other members of the firm regularly had lunch together at the Union League Club in Chicago. Chrystal and Conte dispute the frequency of the lunches but, at a minimum during 1972–1975, when Conte was a special partner, it would have been at least once a month.

Although he was unable to recall a specific instance or a specific topic discussed with Conte, Chrystal nonetheless testified that Panduit matters, especially the overseas patent opposition proceedings, were discussed frequently because it was unusual to have so many going on at one time. Chrystal's testimony was generally corroborated by Thomas Peterson, although he too could not recall specifically that Conte was present at any of these discussions.

The district court ruled that any specific confidences known to Mr. Chrystal could not be disclosed, recognizing that this created a dilemma to All States with respect to proving that Conte received no confidences. However, Chrystal was permitted to identify general areas of confidences. In addition to the opposition matters, he recalled two others, one in 1969 relating to

replacing a German associate whose work was not satisfactory and one relating to a French matter which was of public record. He could not remember passing on these confidences, or any other, to Mr. Conte. His testimony essentially was that he must have shared Panduit confidences with Conte because of the frequency of the lunches and because he was like a broken record repeatedly talking about the Panduit oppositions. His only specific recollection of consulting with Conte on any matter was asking him about how to bill on a time basis since Ladas & Parry, prior to organization as a law firm, simply charged flat fees for particular services.

Conte testified that he does not recall ever receiving any Panduit confidences while at Ladas & Parry. In addition, he testified that he has no present recollection of any Panduit confidences, if he received any, and that he has never communicated to anyone at the Laff Firm any Panduit confidences. Further, Mr. Laff testified that no Panduit confidences were received from Conte.

After hearing the parties' testimony, and an expert's testimony regarding All States' possible expense, if it were to change counsel, the trial judge stated:

My decision is governed primarily by the decision of the Seventh Circuit in *Freeman v. Chicago Musical Instrument Company* [689 F.2d 715 (1982)] * * *.

\* \* \* \* \* \*

I have already held in my order of November 16, 1982, that there is a substantial relationship between the matters which were being worked on by Ladas & Parry and the subject matter of the instant lawsuit. The mere appearance of impropriety which I was prepared to hold existed in this case without even going to the question of whether there was any actual imparting of confidential information is, under the Freeman case, insufficient to warrant disqualification. There must be more than the mere appearance of impropriety. There must be actual possession of confidential information by the attorney whose disqualification is sought.

Such actual possession of confidential information is presumed to exist upon a showing of the substantial relationship. However, this presumption can be rebutted. The attorney whose disqualification is sought has the burden of rebutting the presumption. Under the Freeman case, that attorney has the burden of, quote, "clearly and effectively," closed quote, rebutting the presumption.

What is it that he must rebut? He must rebut the presumption that he had confidential information, or, in other words, he must prove that he did not have knowledge of the confidences of the client.

It is important to note that the burden is not simply that of proving that there is no present recollection of any confidences of the client. Indeed, that distinction is pivotal in this case. What the attorney must prove is that he never received any confidential information whether or not he presently remembers either the confidential information or whether he received it.

\* \* \* \* \* \*

This case really turns on the burden of proof. If it were Panduit's burden to prove that Conte received and presently retains confidential information, Panduit would lose. That, however, is not the burden. It is All States' burden to prove that Conte never received confidential information in the first place, and I find that the evidence does not clearly and effectively establish that proposition.

In summary, the district court made the following four findings of fact:

One, All States has not proved clearly and effectively that Conte never received any confidential information concerning matters relevant to this case while he was with the firm of Ladas & Parry.

Secondly, All States has proved clearly and effectively that Mr. Conte has no present recollection of any such confidential information.

Third, *All States has proved clearly and effectively that Mr. Conte has not communicated to anyone at the Laff Firm any confidential information concerning Panduit which he may have received while at the Ladas & Parry firm.* [Emphasis added.]

Fourth, All States has not proved clearly and effectively that there is no possibility of an inadvertent use of such confidential information by Mr. Conte should he at some time in the future recollect that information.

On the basis of these findings, the district court concluded that Conte and the Laff Firm must be disqualified as counsel for All States. It also noted that the disqualification imposed a very substantial economic hardship on All States in light of the testimony that it would take at least $30,000 for new counsel to acquire the necessary knowledge in order to adequately represent All States. Moreover, the trial judge believed that the likelihood of actual prejudice to Panduit, if the Laff Firm remained as counsel, would be very slight.

All States urged that the court allow the Laff Firm to continue under an order that screened Conte from the case. In denying that remedy the court reasoned that it could not possibly find as a matter of fact that Conte had not already inadvertently passed on some confidence.

Because the court felt "there is some likelihood that the Court of Appeals will disagree with my findings and conclusions", and "in the interest of doing the

least harm to anyone," it ordered the Laff Firm to do no more work on the case until the disqualification matter was resolved on appeal and stayed proceedings.

## Issues

1. Whether or not this court has jurisdiction to review the disqualification order?
2. Which law to apply in this case?
3. Whether or not the district court erred in disqualifying Robert Conte and the Laff Firm from further representation of All States?

## OPINION

### I

#### Jurisdiction

As a threshold matter, Panduit argues that the district court's order is not appealable under 28 U.S.C. § 1295(a)(1) (1982).[3] It asserts, citing the recent case of *Flanagan v. United States*, —— U.S. ——, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984), that a pre-trial grant of a motion to disqualify counsel is interlocutory and is, therefore, not an immediately appealable final decision. We disagree.

This court has jurisdiction of an appeal from a final decision of a district court pursuant to section 1295(a)(1). Since a motion to disqualify counsel is not one of the enumerated interlocutory orders that are appealable as of right under 28 U.S.C. § 1292(a)[4] and this court has yet to have

---

3. Section 1295(a)(1) states:

(a) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from a final decision of a district court of the United States, * * * if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title, except that a case involving a claim arising under any Act of Congress relating to copyrights or trademarks and no other claims under section 1338(a) shall be governed by sections 1291, 1292, and 1294 of this title.

4. This court's jurisdiction to review interlocutory decisions is stated in 28 U.S.C. § 1292(c) (1982). Section 1292(c) states in pertinent part:

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title * * *.

Section 1292(a) (1982) in turn states:

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, * * * or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, ex-

jurisdiction under 28 U.S.C. § 1292(b),[5] the grant of such a motion is appealable only if deemed final under certain exceptions such as the "collateral order" doctrine established by *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715 (7th Cir. 1982). *See generally* 9 *Moore's Federal Practice* ¶ 110.13[10] (2d ed. 1983).

Although the *Flanagan* decision is relevant to our threshold question, it is nonetheless not determinative. The fundamental difference between *Flanagan* and the instant case is that the former is a criminal case whereas the latter is civil. The policy considerations regarding piecemeal appellate review in a criminal case are explicated in *Flanagan*. The Court recites the balance between the strong interest of an accused to have a speedy resolution of the charges against him as guaranteed by the Sixth Amendment and the societal interest in providing speedy trials in order to reduce the load in court dockets, detention facilities, etc. In light of these concerns, the Court permits interlocutory review of only three categories of criminal cases under the "collateral order" exception;[6] a grant of a motion to disqualify counsel is not one of them. Thus, the rationale for denying

review of a grant of a motion to disqualify counsel in a criminal context, such as the concerns for speedy trials, is inapplicable in a civil case. *Cf. Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).[7]

The Court of Customs and Patent Appeals, one of our predecessor courts, has ruled that a grant of a motion to disqualify counsel is an immediately appealable decision. *Ah Ju Steel Co. v. Armco, Inc.*, 680 F.2d 751, 753 (CCPA 1982).[8] This result has also been reached in the Seventh Circuit. *See Freeman, supra.* Accordingly, the order disqualifying counsel before us in this case is immediately appealable.

## II

### *Choice of Law*

After considering the jurisdictional question, we must then decide the choice of law question. In our recent opinion of *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1445, 221 USPQ 97, 110–11 (Fed.Cir.1984), we noted, *sua sponte*, the choice of law question in relation to pendent matters, but found it unnecessary to decide that question.[9] In the instant ap-

---

cept where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

**5.** *See* section 1292(c), n.5, *supra; Harrington Mfg. Co. v. Powell Mfg. Co.*, 709 F.2d 710 (Fed. Cir.1983) (en banc), *cert. denied*, — U.S. —, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984).

**6.** The three categories are (1) orders denying motions to reduce bail, (2) orders denying motions to dismiss an indictment on double jeopardy grounds, and (3) orders denying motion to dismiss an indictment on Speech or Debate (legislative activities) grounds. *Flanagan*, — U.S. at —, 104 S.Ct. at 1055.

**7.** The District of Columbia Circuit has recently ruled that a grant of a motion to disqualify

counsel in a civil case is an immediately appealable decision. It also analyzed and distinguished *Flanagan. Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038 (D.C. Cir.1984); *see also Interco Sys., Inc. v. Omni Corp. Serv., Inc.*, 733 F.2d 253 (2d Cir.1984) (per curiam).

**8.** Although the jurisdictional basis for the *Ah Ju Steel* case was 28 U.S.C. § 1541(a) (Supp. V 1981), it is identical to our present jurisdictional basis in section 1295(a)(1) in regard to the aspect relating to finality of decisions. Similarly, our present jurisdictional basis, section 1295(a)(1), has been treated, in regard to finality of decisions, as identical to the jurisdictional basis for the *Flanagan* and *Firestone* cases, 28 U.S.C. § 1291. *Tenneco Resins, Inc. v. Reeves Bros.*, 736 F.2d 1508 (Fed. Cir.1984).

**9.** This court has jurisdiction over pendent matters when they are attached to a patent claim pursuant to 28 U.S.C. §§ 1295(a) and 1338. Pendent matter jurisdiction in the Federal Circuit encompasses both: (1) the traditional pendent state matters, *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d

peal, we again note, and decide, the choice of law question in relation to procedural matters that do not pertain to the patent issues.

As stated in 28 U.S.C. § 1295(a),[10] this court has *exclusive* jurisdiction of, *inter alia,*

> an appeal from a final decision of a district court if the jurisdiction of that court was based, in whole or in part, on section 1338[11] of this title * * *.

■ Since our jurisdiction to review a district court's decision is predicated on the presence of a bona fide patent claim in that action, we, naturally, have the exclusive jurisdiction to review any other matters which were tried below. One of such other matters is disqualification of counsel.

■ We recognize, as did Congress, the unique jurisdictional grant of this court —specific, nationwide subject matter jurisdiction. This jurisdictional grant, however, places practitioners and district courts in a unique posture: they are accountable to two different courts of appeals. Such a posture raises questions relating to *stare decisis* and certainty in the law. *See generally* 1B *Moore's Federal Practice* ¶ 0.402[1]. Since a district court is bound by the law of its circuit, *see Hasbrouck v. Texaco, Inc.,* 663 F.2d 930, 933 (9th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982), a district court exercising jurisdiction pursuant to 28 U.S.C. § 1338 is bound by the substantive patent law of this circuit. The requirement to obey the law of its circuit causes practitioners and district judges, in general, to follow the substantive patent law as set forth by this court in "patent" cases and to follow the "general" laws as set forth by their regional circuit court in non-patent cases. That requirement, however, is the result that Congress sought to achieve in creating the Federal Circuit.

Such obedience, however, creates a problem that was possibly unforeseen by Congress. That problem is which law must a district court apply in matters that are procedural in nature such as the attorney disqualification question in the instant case. In a case where this court does not have appellate jurisdiction, the district court would be deciding that question in light of the law of its regional circuit court. Since we have jurisdiction to review all matters in a case that is appealable to us, the district court would then be obligated to decide that question in light of our precedents. Such bifurcated decisionmaking is not only contrary to the spirit of our enabling legislation but also the goal of the federal judicial system to minimize confusion and conflicts.

Since our enabling statute fails to enunciate any guidance for this question, an analysis of the legislative history must be made. *United States v. John C. Grimberg Co.,* 702 F.2d 1362 (Fed.Cir.1983) (in banc).

The purpose of this court's enabling act, the Federal Courts Improvement Act of 1982 (the "FCIA"), Pub. L. 97–164, 96 Stat. 25, is to provide:

> [A] forum that will increase doctrinal stability in the field of patent law.

218 (1966), *see* n.19, *infra;* and (2) pendent federal matters such as copyright or trademark claims under section 1338, or antitrust claims. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (Sherman Act); *Hughes v. Novi American, Inc.,* 724 F.2d 122, 220 USPQ 707 (Fed. Cir.1984) (Copyright Act); *Litton, supra* (Trademark Act); and *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 220 USPQ 763 (Fed. Cir.1984) (Sherman Act).

**10.** *See* n.4, *supra.*

**11.** 28 U.S.C. § 1338 (1982) states:

§ 1338. Patents, plant variety protection, copyright, trade-marks, and unfair competition

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws.

# 1574

Based on the evidence it had compiled, the Hruska Commission singled out patent law as an area in which the application of the law to the facts of a case often produces different outcomes in different courtrooms in substantially similar cases. Furthermore, in a Commission survey of practitioners, the patent bar indicated that uncertainty created by the lack of national law precedent was a significant problem * * *.

\* \* \* \* \* \*

The testimony received by the committee also supported the basic objective of providing for uniformity of doctrinal development in the patent area. * * *

\* \* \* \* \* \*

The creation of the Court of Appeals for the Federal Circuit will produce desirable uniformity in this area of the law. S.Rep. 97–275, 97th Cong., 1st Sess. 5, *reprinted in* 1982 U.S.Code Cong. & Ad. News 11, 15.

■ It is, therefore, clear that one of the primary objectives of our enabling legislation is to bring about uniformity in the area of patent law. "[T]he central purpose [of the FCIA] is to reduce the widespread lack of uniformity and uncertainty of legal doctrine that exist in the administration of patent law." H.R. Rep. 97–312, 97th Cong., 1st Sess. 23. This court was created, as contemplated by the Congress, to achieve uniformity and to reduce uncertainties in this area. This court, thus, has a mandate to achieve uniformity in patent matters.

■ The fundamental underpinning for uniformity was Congress' abhorrence of conflicts and confusion in the judicial system. That was the underlying motivation for the creation of this court, and it must remain the spirit and guiding principle of this court. We must, therefore, be cognizant of the guidance provided by the legislative history and the underlying Congressional motivation as we resolve the choice of law question.

In addition to the guidance provided by the legislative history, we must resolve this choice of law question by considering the general policy of minimizing confusion and conflicts in the federal judicial system. Where, as here, a procedural question [12] that is independent of the patent issues is in dispute, practitioners within the jurisdiction of a particular regional circuit court should not be required to practice law and to counsel clients in light of two different sets of law for an identical issue due to the different routes of appeal. An equal, if not more important, consideration is that district judges also should not be required to decide cases in this fashion. For instance, practitioners and district judges in the Seventh Circuit should not be saddled with two different sets of requirements regarding attorney disqualification, one for cases appealed to the Seventh Circuit and one for cases appealed to this court.[13] The possibility of different requirements should be minimized especially where a dispute is totally unrelated to patent issues and the resolution of that dispute does not impinge on the goal of patent law uniformity. The standard for attorney disqualification, relating to a district court's power to supervise and to conduct local operating procedure, should not be different just because the reviewing path on such matter is different.

■ We, therefore, rule, as a matter of policy, that the Federal Circuit shall review procedural matters, that are not

12. Procedure is defined as "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach v. Wilson & Co.,* 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941). Whereas the "substantive law relates to rights and duties which give rise to a cause of action," procedure is defined as either "the machinery for carrying on the suit" or "the modes of conduct of litigation and judicial business." *Jones v. Erie R.R. Co.,* 106 Ohio St. 408, 412–13, 140 N.E. 366, 368 (1922).

13. The possibility of creating a dual system of requirements is especially great where a particular regional circuit court has clearly spoken on the issue.

unique to patent issues, under the law of the particular regional circuit court where appeals from the district court would normally lie.[14] This policy is within the intent and spirit of not only our enabling statute but also the general desire of the federal judicial system to minimize confusion and conflicts. Since our mandate is to eliminate conflicts and uncertainties in the area of patent law, we must not, in doing so, create unnecessary conflicts and confusion in procedural matters[15].

The exact parameters of this ruling will not be clear until such procedural matters are presented to this court for resolution.

■ Although the adoption of this policy could on occasion require this court to reach disparate results in procedural matters in light of disparate viewpoints from the regional circuit courts, it is nonetheless preferable for the twelve judges of this court to handle such conflicts rather than for countless practitioners and hundreds of district judges to do so. The task of deciding issues in light of different laws is no worse than the existing duty of federal judges to decide diversity cases or pendent state matters in view of state law. Reviewing pendent matters in light of state law is part of this court's jurisprudence.[16]

■ This policy, however, does not preclude this court from following existing or creating new law regarding any and all matters in cases where this court has *exclusive* jurisdiction over *all appeals* from a particular court. *See* 28 U.S.C. §§ 1295(a)(3) and 1295(a)(5) (1982). For example, the attorney disqualification standard enunciated in the *Ah Ju Steel* case is applicable for this court as well as the

Court of International Trade and the Claims Court. We may, in future cases, alter or extend the *Ah Ju Steel* standard irrespective of our views in this case or other cases if they are from forums within our exclusive jurisdiction over all appeals from a particular court. The viewpoints regarding attorney disqualification that we take in the instant case do not preclude us from taking a contrary viewpoint when deciding the identical issue in a case where we have exclusive jurisdiction over all appeals from a particular court.

■ When we review procedural matters that do not pertain to patent issues, we sit as if we were the particular regional circuit court where appeals from the district court we are reviewing would normally lie. We would adjudicate the rights of the parties in accordance with the applicable regional circuit law. *Accord, In re International Medical Prosthetics Research Associates, Inc.,* 739 F.2d 618 (Fed. Cir.1984). *Cf. Guaranty Trust Co. v. York,* 326 U.S. 99, 108–9, 65 S.Ct. 1464, 1469–70, 89 L.Ed. 2079 (1945) (for diversity jurisdiction purposes, a federal court is, in effect, only another court of the state). Where the regional circuit court has spoken on the subject, we must apply the law as stated. *Cf. Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Where the regional circuit court has not spoken, we need to predict how that regional circuit would have decided the issue in light of the decisions of that circuit's various district courts, public policy, etc. *Cf. Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Jones &*

---

**14.** This policy is not inconsistent with our prior decisions in which procedural matters that do pertain to patent issues, such as whether proof of non-experimental use is necessary to establish a prima facie defense of an on-sale bar, must conform to Federal Circuit law. *See Barmag Barmer Maschinenfabrik v. Murata Machinery Ltd.,* 731 F.2d 831, 839, 221 USPQ 561, 567–68 (Fed.Cir.1984). Since those procedural matters are related to patent issues, they have a direct bearing on the outcome of those determinations.

**15.** This ruling may be applicable to our review of district court decisions which do not involve patent claims. *See* 28 U.S.C. § 1295(a)(2) (1982). For example, cases involving the "Little Tucker Act," 28 U.S.C. § 1346(a)(2) (1982). *Heisig v. United States,* 719 F.2d 1153 (Fed.Cir. 1983). We need not and do not decide this question.

**16.** *See Litton, supra* (Minnesota unfair competition law); *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 219 USPQ 377 (Fed.Cir.1983) (Texas probate code, breach of contract).

*Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 285 (3rd Cir. 1980); *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603 (7th Cir.1975); *Warren Brothers v. Cardi Corp.*, 471 F.2d 1304 (lst Cir.1973).

■ Accordingly, in order not to violate the spirit of our enabling legislation and in order to minimize confusion and conflicts, we shall decide the disqualification order of the instant appeal in light of Seventh Circuit law.

### III

### *Disqualification*

The remaining issue is whether or not the district court erred in disqualifying Robert Conte and the Laff Firm from further representation of All States.

### A. *Policy Considerations Underlying Disqualification*

■ Attorney disqualification of counsel is a part of a court's duty to safeguard the sacrosanct privacy of the attorney-client relationship which is necessary to maintain public confidence in the legal profession and to protect the integrity of the judicial process. *Freeman*, 689 F.2d at 721. Where, as here, an attorney of a law firm that represents a party was at one time in a law firm that represented the adverse party, ethical concerns regarding the attorney-client relationship are raised.[17] Such concerns involve the fundamental principle that an attorney shall maintain the confidentiality of the information that he had obtained from a client. *Freeman*, *supra*. This principle is embodied in Canons 4 and 9 of the ABA Code of Professional Responsibility.[18] In performing this duty, the Seventh Circuit has "emphasized the delicacy of the balance that must be

17. *See generally Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv. L. Rev. 1244 (1981).

18. Canon 4 states: "A Lawyer Should Preserve the Confidences and Secrets of a Client."
Canon 9 states: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

maintained between the right of confidentiality and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983).

■ In determining Seventh Circuit disqualification law, we must look not only at what the court has said, but equally importantly, at how the court has applied its view of the law to the facts of particular cases. Fortunately we have the benefit of a recent Seventh Circuit case heard in Banc, *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 206 USPQ 769 (7th Cir.1979), which, obviously, is controlling. In *Novo*, the facts in support of disqualification were at least as strong as those before us; nevertheless a disqualification order was set aside. More recently, a panel of the Seventh Circuit in *Freeman* set aside a disqualification order *as a matter of law* on the ground that the principles in *Novo* had not been properly applied. The results, as well as the language, in these recent cases indicate that the Seventh Circuit considers the right of a party to select counsel of his choice to be a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety *has occurred. See* also *Whiting Corp. v. White Machinery Corp.*, 567 F.2d 713 (7th Cir. 1977) (no disqualification). A disqualification order discredits the bar generally and the individual attorneys particularly. Thus, while there can be no hesitation to disqualify where impropriety *has occurred,* as in the cases cited by the parties upholding disqualification—namely, *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir. 1983) and *LaSalle National Bank v. County of Lake*, 703 F.2d 252 (7th Cir.1983), judges must exercise caution not to paint with a broad brush under the mis-

Although the ABA Code of Professional Responsibility is the applicable rule in most jurisdictions, it has not been uniformly adopted by all district courts. *See Paul E. Iacono Structural Eng'r, Inc. v. Humphrey,* 722 F.2d 435 (9th Cir. 1983).

guided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect. The opposite effects are just as likely—encouragement of vexacious tactics and increased cynicism by the public.

 When applying Seventh Circuit attorney disqualification law, we must recognize, as does that circuit, that:

> [D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when *absolutely necessary*. (Emphasis added.)

*Freeman*, 689 F.2d at 721. Furthermore, motions for attorney disqualification "should be reviewed with extreme caution for they can be misused as techniques of harassment." 689 F.2d at 722. Most importantly, a court must be "guided by the awareness of *the delicate balance* which must be maintained between the right of an individual to retain counsel of his free choice and the necessity that the Court uphold ... ethical standards...." *Whiting Corp.*, 567 F.2d at 715 (emphasis added).

### B. *Presumptions Underlying Disqualification*

In ruling on a disqualification motion directed to an individual and a firm, all cases which we have reviewed in the Seventh Circuit show that the court analyzes disqualification of the firm separately from the individual and carefully weighs each step in each disqualification. However, the movant for disqualification has several presumptions working in his favor.

 First, proof by the movant of a base fact, the existence of a so-called "substantial relationship" between past work and the suit at hand, gives rise to a presumption that an attorney who actually did the past work received confidences relevant to the present litigation. Second, there is a presumption that attorneys within a firm share each other's confidences, so that knowledge will be imputed from one to the other.

In the decision under review, no clear distinction was drawn between the above two presumptions. Indeed, Panduit's brief totally confuses the two, invoking the presumption arising from a substantial relationship, and the extremely strict burden of proof to overcome it, directly against Conte. The district court also inextricably intertwined the two presumptions into a single presumption against Conte. The case before us, however, does not fit into the simple pattern of an attorney who had worked on Panduit matters moving to another firm, which would make the case comparable to the above cited *LaSalle* case, for example. Panduit's analysis would be apropos only if Chrystal rather than Conte had moved to the Laff Firm. Proof of the substantial relationship here gave rise to a presumption against Chrystal, not Conte. Moreover, Chrystal and the client Panduit are not in an adversarial relationship (*Cf. Novo*, 607 F.2d at 197). Chrystal's knowledge is being *imputed* to Conte. *Freeman*, 689 F.2d at 723. No Panduit confidences could have been obtained by Conte as a result of *work* by him on Panduit matters since he never performed such work. Further, the district court held that Panduit failed to prove that Conte actually received any Panduit confidences. Nevertheless, based on the fact that Conte and Chrystal were in the same firm, confidences have to be *imputed* from Chrystal to Conte unless Conte effectively rebutted the sharing presumption.

 A presumption of having received confidences from *having worked* on relevant related matters is difficult to overcome. Indeed, it is attackable only on the facts with respect to the nature of the earlier work.[19] In accordance with Seventh Circuit precedent, the district court refused

---

19. *See LaSalle National Bank v. County of Lake,* 703 F.2d 252, 255–256 (7th Cir.1983) which delineates a three-part test for determining whether or not the prior work and the present litigation are substantially related and speaks of "the very strict standard of proof" to rebut it. This presumption may be close to irrebuttable. *See Novo,* 607 F.2d at 196, 197.

to allow Chrystal to divulge specific confidences that he knew. *Novo*, 607 F.2d at 196. While All States appears to have attempted to prove that Chrystal knew only matters that were of public record, we cannot say that the court erred in any way in finding a substantial relationship between the past Panduit work of Chrystal and the present litigation.[20] *Cf. Novo*, 607 F.2d at 196.

With respect to disqualification of Conte, the district court held that the presumption against him could be rebutted if he could prove that he never received any confidential information. We will discuss Conte's disqualification again later. At this juncture the point to be made is that Conte was disqualified vicariously because of Chrystal's work not because of his own work. The Laff Firm was then disqualified solely because of the "sharing" presumption. It is significant, however, that underlying the presumption invoked against the Laff Firm is Conte's *imputed* knowledge.

## IV.

### The Laff Firm Disqualification

#### A. Reimputing Imputed Knowledge

While the Seventh Circuit has not expressed itself specifically on the imputation of knowledge from one firm to another through a *vicariously* disqualified attorney[21], the panel in *Freeman* cited with approval the Fifth Circuit case of *Ameri-*

*can Can Company v. Citrus Feed Co.*, 436 F.2d 1125 (5th Cir.1971). Where the basis for granting a disqualification order was multiple presumptions, the Fifth Circuit reversed, holding:

> However, new partners of a vicariously disqualified partner, to whom knowledge has been imputed during a former partnership, are not necessarily disqualified: they need show only that the vicariously disqualified partner's knowledge was imputed, not actual. *Laskey Bros. of W. Va. Inc. v. Warner Bros. Pictures, Inc., supra* 224 F.2d at 827.
>
> If these ethical principles are applied to the instant case, it becomes evident that disqualification of Miller and the Covington firm is unnecessary. Indeed, resort to so drastic a measure would not only be unwise, but would also set disturbing precedent. If the Prossers' rationale were accepted, imputation and consequent disqualification could continue *ad infinitum*. It is not surprising, then, that the courts have carefully limited their travels in this area.

436 F.2d at 1129.

■ While Chrystal and his partner, Peterson, testified concerning numbers of luncheons with Conte and the general tenor of conversations at the firm luncheons, such testimony does not alter the fact that Conte's knowledge is imputed, not actual. The testimony added nothing of substance to the presumption itself. The presump-

---

**20.** We have some questions about "confidences" (in the sense used here of "attorney-client confidences") received prior to 1971 before Ladas & Parry was organized as a law firm. This point was not developed and it is not material to our decision here.

**21.** As described in *Attorney's Conflict of Interests: Representation of Interest Adverse to that of Former Client*, 55 B.U.L. Rev. 61, 70 n.51 (1975):

> This pattern of imputation, one of several possible patterns, is presented in *Laskey Bros. v. Warner Bros. Pictures, Inc.*, 224 F.2d 824, 827 (2d Cir.1955), *cert. denied*, 350 U.S. 932 [76 S.Ct. 300, 100 L.Ed. 814] (1956). Courts have stopped short of adopting a double imputation theory. *See, e.g., American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129–30 (5th Cir.1971). The double imputation theory

would work as follows: Attorney A of Firm 1 represents Client C. The receipt of confidential information is imputed to Attorney B of Firm 1, who did not participate in the representation. Attorney B leaves Firm 1 and joins Firm 2. Under the single imputation theory, Attorney B cannot represent a party opposing C even though he has left Firm 1. The double imputation theory would impute the receipt of confidential information, already imputed to Attorney B, to Attorney D of Firm 2, so that Attorney D would be foreclosed from representing an interest adverse to C's. The double imputation theory would invent conflicts where none exist. However, if there were actual disclosure to Attorney D, he should surely withdraw, although his withdrawal would not be based on a double imputation theory.

tion that members of a firm share confidences arises simply because lawyers frequently discuss the matters on which they are working with other members of their firm. However, there is no dispute that Conte never worked on any Panduit matters, and his knowledge of Panduit affairs is, therefore, *imputed* knowledge. Thus, under the rationale of *American Can,* the Laff Firm would be entitled to prevail since knowledge cannot be *imputed* to the Laff Firm based on knowledge *imputed* to Conte.

### B. *Standard To Overcome Shared Knowledge*

Alternatively, even if the Seventh Circuit were to approve the reimputation of imputed knowledge, the record here does not support Panduit's motion against the Laff Firm under independent established principles of that circuit.

 The effect of a presumption of fact, here the fact of shared confidences, is to place upon the opposing party the burden of establishing the nonexistence of that fact.[22] The burden on the opposing party, however, is limited to *production* of evidence. The burden of *persuasion* on the existence of the presumed fact remains throughout on the party invoking the presumption.[23] The movant for disqualification, as on any other motion, bears the ultimate burden.

 A presumption does not enjoy the status of evidence. If a finding on the evidence is made that a presumed fact has been effectively rebutted, the presumed fact ceases to exist. It does not linger on to be weighed against the evidence. If evidence is provided which falls short of meeting the threshold of rebuttal, the presumed fact retains its viability. Hence, the standard to establish the nonexistence of the presumed fact may be critical.

 Under Seventh Circuit law, to rebut a presumption of shared confidences

within a firm, the district court is required to find:

> [W]hether the knowledge of the "confidences and secrets" of [the client of the first firm] which [the attorney] brought with him *has been* passed on to or *is likely to be* passed on to the members of the [second] firm. [Emphasis added.]

*Schiessle,* 717 F.2d at 421.

The record in this case discloses that the district court initially made the following finding:

> Third, All States has proved clearly and effectively that Mr. Conte has not communicated to anyone at the Laff firm any confidential information concerning Panduit which he may have received while at the Ladas & Parry firm.

This finding effectively negated the imputation of knowledge to the Laff Firm at the time the firm was disqualified. During the subsequent argument on screening Conte, rather than disqualifying the Laff Firm, the district court felt compelled to qualify that finding as follows:

> I am going to have to modify that finding. The more we talk about this case, the more refined it becomes, but I cannot possibly find as a matter of fact *that he [Conte] has not already inadvertently passed on some confidence.* There is no way of my knowing that. [Emphasis added.]

It is in the standard stated above that the district court erred as to the Laff Firm. An *absolute* finding of no *possible* inadvertent sharing of confidences is not required to establish an effective rebuttal. The proof of a negative renders certainty virtually impossible. If such were the requirement, disqualification would have been mandated in the *Novo* case. There, a partner in a firm, Mr. Cook, worked for a particular client (Baxter-Travenol). Upon leaving the firm six months later, Cook filed suit on behalf of Baxter-Travenol against Novo. Novo hired Cook's former

---

**22.** FRE Rule 301, Notes of Advisory Committee on Proposed Rules. *See, generally,* McCormick, *Evidence* § 345 (2d ed. 1972).

**23.** Fed. R. Evid. Rule 301, Notes of Committee on the Judiciary, Senate Report No. 93–1277.

firm, and Baxter-Travenol moved for the firm's disqualification. With respect to the six month interim, the presumption of shared confidences was applied. It would have been impossible to hold with certainty that confidences were not inadvertently disclosed to the firm by Cook. Indeed, Cook's affidavit averred that some client confidences were passed on. 607 F.2d at 196, n.4. A panel of the court, which first heard the appeal, resolved doubts in favor of disqualification. The Seventh Circuit, in banc, overturned that holding on the basis of affidavits from the firm members that they received no confidences. There was no evidence from Cook that they did, specifically with respect to the subject matter of the suit. The presumption was held to be overcome.

■ Here, we have comparable, if not stronger, facts for no disqualification. The presumption against the Laff Firm would not be as difficult to overcome as in *Novo* since one of the circumstances which affects the likelihood of confidences being passed on is that Conte was not shown to have any confidences. His taint is vicarious. Cook's taint was direct. In any event, Laff, like Cook's former partners, credibly testified, per the district court, that no confidences were received. Conte credibly testified, per the district court, that he passed on no confidences. The district court's error was in requiring *absolute certainty* that no confidences had been *inadvertently* shared. A legal requirement of that magnitude makes the presumption effectively irrebuttable, contrary to the law of the Seventh Circuit. *Novo*, 607 F.2d at 197; *Freeman*, 689 F.2d at 723. As Panduit acknowledges in its brief here, the standard is *likelihood* not *certainty*, and all of the circumstances must be weighed in determining such likelihood.

### C. Screening

■ Despite the trial court's "complete satisfaction" that the Laff Firm received no confidences through Conte, disqualification of the firm was required, in that court's view, because of the absence of a screen or wall *at the time* Conte got there. Panduit cites as authority for the correctness of this proposition *LaSalle National Bank v. County of Lake, supra.* Contrary to the holding of the court and Panduit's argument, the absence of screening is not fatal to All States' position. As illustrated in the in banc *Novo* case, the presumption of sharing between partners of a firm can be overcome by testimonial evidence, despite the absence of screening. The district court failed to appreciate that evidence of voluntary screening procedures is simply one type of evidence that may overcome the presumption of shared confidences. Thus, the question of the Laff Firm disqualification cannot be disposed of simply by the absence of screening. The question before the district court was whether, considering all the evidence, it was *likely* that confidences had been passed to the firm. In the face of the district court's finding that the Laff firm had *received no confidences* from Conte up to the time of the hearing, it was error to find that it was "too late" to formally endorse screening procedures.

Nowhere in Seventh Circuit opinions has proof of *formal screening* been delineated as the *sine qua non* of establishing the nonexistence of the presumed fact that confidences have been shared. Within the factual context of *LaSalle*, 703 F.2d at 259, the court merely opined that a *timely* screening arrangement might have prevented disqualification in that case.

Similarly, in *Schiessle*, the relevant inquiry was whether it was likely that confidences had been shared. Interpreting its own *LaSalle* case, the Seventh Circuit stated in *Schiessle* that "the presumption of shared confidences *could* be rebutted by demonstrating [specific institutional mechanisms]" and that the determination "*must* be made on a case-by-case basis". 717 F.2d at 421 (emphasis added). The court concluded in *Schiessle* that the absence of a wall to screen an attorney with direct, rather than imputed, knowledge was dispositive in that case.

The shared confidences presumption is fully rebutted by a finding of the nonexistence of the presumed fact, as made here at trial. Since *Schiessle* must be read with *Novo*, there is no reason to conclude that the passage in *Schiessle* regarding institutional mechanisms being in place at the time the tainted attorney joined the firm is a requirement. Quite the contrary, the context of *Schiessle* and its predecessors renders it more likely that the court was merely expressing a willingness to consider whatever evidence is presented to rebut the presumption.

In any event, in *Novo* the presumption of shared confidences was overcome despite six months of a continued partnership relationship without a wall to prevent sharing. A rule that screening is the exclusive means of rebutting the presumption that confidences have been shared, *regardless of independent evidence*, cannot rest on *LaSalle* or *Schiessle*.

▮▮▮▮ Presumptions of fact have been created to assist in certain circumstances where direct proof of a matter is for one reason or another rendered difficult. They arise out of considerations of fairness, public policy, and probability, and are useful devices for allocating the burden of production of evidence between the parties. However, derived as they are from considerations of fairness and policy, they must not be given mechanical application. Thus, with each presumption in the chain utilized in this case, we must not lose sight of the Seventh Circuit's view that attorney disqualification as a prophylactic device should not be imposed unless "absolutely necessary". We must not give undue dignity to a procedural tool and fail to recognize the realities of the particular situation at hand.

One of the realities accompanying this particular disqualification is that reversal of the district court will likely result in *no prejudice* to Panduit. The district court analyzed the prejudice to Panduit from the Laff Firm remaining in the case as follows:

> The possibility of prejudice resides entirely in the prospect of Mr. Conte recovering whatever memory he might perchance recover concerning some confidential information he may or may not have received at some remote time in the past. The probability that any such revival of memory would materially assist Mr. Laff or any other member of the Laff firm at this stage of this litigation seems to me to be very small.

On the other hand, the prejudice to All States is catastrophic. Its long standing counsel, a relationship established before this case began, is no longer available and could not even consult on transfer of the case to another firm. The estimate of costs in 1981 for bringing in new counsel was $30,000–$50,000, no doubt now substantially more. Other pending litigation will also be affected. The *balancing* of interests at the time of the hearing did not require disqualification of the Laff Firm.

## V.

### *The Conte Disqualification*

With respect to Conte, the district court order is vacated.

The impropriety of Conte's disqualification was urged by All States to negate the basis for disqualification of the Laff Firm. However, the Laff Firm should not have been disqualified in any event since the presumption as to the firm had been overcome regardless of the ruling on Conte.

If it were urged that Conte be allowed to stay in the case, we would have to remand for reconsideration because an incorrect legal presumption was applied against him. Cf. *Freeman, supra.* However, in view of All States' position on appeal, we remand to the district court for an appropriate order formalizing procedures which will screen Conte from involvement in these and related proceedings.

### *Conclusion*

We hold that this disqualification order is an appealable final decision. In addition, as a matter of policy, the Federal Circuit shall and did decide this case, which in-

volved a matter not pertinent to the patent issues, in view of the law of the regional circuit court where an appeal from the district court would normally lie. Accordingly, we review the present disqualification order under Seventh Circuit law.

 On the issue of disqualification of the Laff Firm, we believe the Seventh Circuit would be likely to endorse the rule of the Fifth Circuit that double presumptions with respect to imputed knowledge cannot be utilized. In any event, the presumption as to the Laff Firm was definitively overcome under the Seventh Circuit standard. A screening order, rather than disqualification, would have been sufficient to prevent even the appearance of impropriety and would have adequately protected Panduit's interests.

The case is remanded for proceedings consistent herewith.

REVERSED-IN-PART, VACATED-IN-PART AND REMANDED.