**In re HECK'S, INC., Debtor in Possession.**

**Appeal of The OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS.**

**Civ. A. No. 2:87–1243.**

United States District Court, S.D. West Virginia, Charleston Division.

Feb. 4, 1988.

Thomas R. Goodwin, Charleston, W. Va., for Heck's, Inc.

Robert Miller, New York City, Frances W. McCoy, Charleston, W. Va., George Skouras, New York City, for Official Committee of Equity Sec. Holders.

Scott L. Hazen, New York City, William F. Dobbs, Charleston, W. Va., for Unsecured Trade Creditors Committee.

David A. Murdoch, Pittsburgh, Pa., P. Michael Pleska, Charleston, W. Va., for Bank Creditors Committee.

Sarah G. Sullivan, Charleston, W. Va., Trustee.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court pursuant to Title 28, United States Code, Section 158,[1] upon the appeal of the Official Committee of Equity Security Holders (hereinafter "Equity Committee") from the Memorandum Order Denying Permanent Employment of Lead Counsel and Local Counsel for Equity Security Holders' Committee, entered by the United States Bankruptcy Court for the Southern District of West Virginia on October 19, 1987.

### I. *Background*

On March 5, 1987, Heck's, Inc., and three of its subsidiaries each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the filing date, Heck's has remained in possession of its property and is authorized to conduct its business as debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

On March 25, 1987, pursuant to Section 1102(a)(2) of the Bankruptcy Code, the bankruptcy court ordered the appointment of the Equity Committee. Two other official committees also were appointed to represent the bank creditors and the trade creditors. The members of the Equity Committee appointed by the bankruptcy court were Citicorp (represented by George A. Skouras), MDC Investment Co. (represented by Steven Mizel); Willard H. Erwin, Jr., and Dr. Allan S. Tauber. By orders entered July 9 and July 28, 1987, the bankruptcy court also appointed E.B. Basham, Sr., and Peter Treves as members of the Equity Committee. Mr. Treves subsequently resigned from the committee for personal reasons. The members of the Equity Committee are geographically diverse, residing in Charleston, New York City, Denver and Los Angeles. Two of the members (Citibank and MDC) are among the largest shareholders of record. Their representatives serve as co-chairmen of the Equity Committee.

On April 22, 1987, at a meeting of the Equity Committee conducted by telephone, Messrs. Skouras, Mizel, Erwin and Tauber, constituting all of the four then-existing members, unanimously voted to employ the law firm of Berlack, Israels and Liberman (hereinafter "BI & L") as the Equity Committee's lead counsel, and Frances W. McCoy as its local counsel, subject to approval of such retention by the bankruptcy court in accordance with Section 1103 of the Bankruptcy Code. On April 24, 1987, the Equity Committee filed a motion with the bankruptcy court to retain BI & L and McCoy as lead and local counsel, respectively. The Equity Committee states that the original retention motion clearly contemplated final and permanent retention of BI & L and McCoy, contained nothing to suggest that bankruptcy court approval

---

1. Title 28, United States Code, Section 158(a) provides:

   The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

was being sought on an interim basis, and complied fully with the requirements of Section 1103 of the Bankruptcy Code and Bankruptcy Rule 2014 for the retention of professionals.

By order entered May 1, 1987, the bankruptcy court authorized counsel's employment, effective as of March 25, 1987, "pending the organizational meeting" of the Equity Committee. The order of May 1 further directed that the Equity Committee "notify the Court, after its organizational meeting, of its intention regarding the final employment of counsel." [2] The Equity Committee states that since it had already held its organizational meeting prior to filing the original retention motion, the May 1 order was apparently issued based on the bankruptcy court's misunderstanding of the facts. The Equity Committee further states that after discussing with the bankruptcy court's staff and the clerk of the bankruptcy court the appropriate procedure to apprise the bankruptcy court of its misunderstanding, McCoy sent a letter dated May 6, 1987, to Samuel Kay, the clerk of the bankruptcy court, in which it was tactfully explained that the organizational meeting had already taken place before the original motion for appointment of counsel was filed. It was further noted that Skouras and Mizel had since been elected as co-chairmen of the committee.[3] Thus, the Equity Committee had in substance promptly complied with the bankruptcy court's order of May 1, 1987. The McCoy letter was entered on the court's docket on May 8, 1987.

Counsel for the Equity Committee continued to serve vigorously as such and made its presence known to the court in various matters, including its initial application for payment of counsel fees and expenses heard by the court on July 1,

---

2. The order of May 1, 1987, styled "Order Approving Interim Employment of Lead Counsel and Local Counsel for Equity Security Holders Committee," provided as follows:

On this day the Court considered a motion of George A. Skouras, a member of the Equity Security Holders' Committee praying for an order approving the retention and employment of the firm of Berlack, Israels & Liberman as lead counsel for the Committee and Frances W. McCoy, Esquire, as local counsel for the Committee. It appearing to the Court that the Equity Security Holders' Committee has not yet held its organizational meeting; however, that the immediate representation by counsel is necessary for the Committee's participation in upcoming proceedings in the case, it is

ORDERED that the Equity Security Holders' Committee is hereby authorized to employ, effective as of March 25, 1987, the firm of Berlack, Israels & Liberman as lead counsel and Frances W. McCoy, Esquire, as local counsel, pending the organizational meeting of such Committee, and that the rates of compensation of such counsel shall be established by the Court upon consideration of applications for compensation of such counsel. It is further

ORDERED that the Equity Security Holders' Committee shall notify the Court, after its organizational meeting, of its intention regarding the final employment of counsel.

3. The McCoy letter stated in pertinent part:

This is to advise you that the Equity Security Holders Committee, appointed in the above-referenced joint-administered cases, has held an organizational meeting by teleconference. Participating in the tele-conference were George Skouras, a representative of Citicorp; Dr. Allen S. Tauber; Steven Mizel, MDC Investment Company; and Willard H. Erwin, Jr. At the request of the Committee, Robert M. Miller and James N. Nolan, Berlak [sic], Israels & Liberman, and myself were parties to the teleconference. Subsequent to such meeting, an Application to Employ Counsel to the Committee was filed under the signature of George Skouras.

On May 1, 1987, Judge Pearson entered an Order which appoints Berlak [sic], Israels and Liberman and myself as interim counsel to the Committee, as it appeared to the Court that an organization meeting had not yet taken place. This may have occurred due to the Committee's desire to not elect a Chairman until each had had opportunity to exchange views and become more familiar with the status of the cases.

Please be advised that the Committee has chosen Co-Chairman George Skouras of Citicorp, 399 Park Avenue, 6th Floor, New York, NY 10043 and Steven Mizel, MDC Investment Company, 3600 South Yosemite, Suite 600, Denver, Colorado 80237.

The McCoy letter is reflected on the bankruptcy court's docket under entry number 293 as the "Response of Equity Shareholders' Committee To Court's Order of May 1, 1987, Identifying Co–Chairmen of Committee, George A. Skouras and Steven M. Mizel, and Counsel for Committee As Robert M. Miller and James M. Nolan of Berlack, Israels & Liberman and Frances W. McCoy," filed on May 8, 1987.

1987. No question was raised as to counsel's status for over three and one-half months until August 26, 1987. At a hearing on fee applications held on that date, the bankruptcy court announced that it did not deem McCoy's letter of May 6, 1987, to be proper under the May 1, 1987, order.[4] The bankruptcy court directed that the Equity Committee meet once again to vote on the permanent employment of counsel and then file a motion for approval of such retention.

Pursuant to this direction, the Equity Committee held a telephonic meeting on September 1, 1987, at which all but one of the members were present. In that meeting, the Committee unanimously reaffirmed the employment of BI & L and McCoy as permanent lead and local counsel, respectively, to perform the services and duties set forth in the original retention motion. In a motion dated September 1, 1987, the Equity Committee, by its co-chairman, George A. Skouras, acting in response to the directive of the bankruptcy court, sought a modification of the original retention order of May 1, 1987, to retain and employ BI & L and McCoy as permanent counsel. No party to this action raised any objection to the Equity Committee's second retention motion and the bankruptcy court held no hearing on the motion.

On October 19, 1987, the bankruptcy court entered its order denying the second retention motion and ordering that the "interim" appointment of BI & L and McCoy as counsel for the Equity Committee would terminate on October 28, 1987. The Equity Committee states that at a telephonic meeting conducted on October 23, 1987, to discuss the October 19 order, it concluded that the October 19 order was without any legitimate basis and contrary to the best interests of its constituency. The Equity Committee unanimously voted for yet a third time to continue the retention and employment of BI & L and McCoy, and further directed counsel to seek a stay of the October 19 order and to file an appeal therefrom.

On October 26, 1987, pursuant to Bankruptcy Rule 8005, the Equity Committee filed a motion with the bankruptcy court for a stay pending appeal. In an order entered October 28, 1987, the bankruptcy court denied the motion for a stay, whereupon the Equity Committee immediately sought and obtained such relief from this court. On the same day, the Equity Committee filed a notice of appeal of the order of October 19, 1987.

## II. *The Orders of October 19 and October 28, 1987*

The order of October 19, 1987, states that:

The Court recognizes that the interests of the equity holders in this case are significant, and that they are entitled to competent, experienced legal counsel. The Court has no objection to the utilization of New York or other out-of-town counsel and recognizes that there is probably a need to employ some out-of-town counsel in this case because of the limited number of local bankruptcy attorneys. Further, there may be issues in this case requiring extensive experience or detached objectivity which out-of-town counsel can provide. However, as the following analysis will show, the Equity Committee [counsel's] current mix of partners and associates, who have been billing at rates considerably in excess of those which prevail in the Debtor's business area for work which is of low quality, is inconsistent with the standards imposed by Amended Administrative Order III.

Order of October 19, 1987, pp. 2–3.

The order of October 19 then denies the second retention motion on the grounds that the Equity Committee's out-of-town counsel, BI & L, has "been billing at rates considerably in excess of those which prevail in the Debtor's business area for work which is of low quality" in contravention of the standards imposed by Amended Administrative Order III, incorporating by reference Section 330 of the Bankruptcy Code. The October 19 order further states that

---

4. The hearing of August 26, 1987, dealt with applications for interim compensation of the Equity Committee's counsel and other professionals retained in the debtors' cases.

"the management, work assignments and billing of lead and local counsel for the Equity Committee are inconsistent with" the standards of Amended Administrative Order III and Section 330.

In arriving at these conclusions, the bankruptcy court compares the staffing and billing practices of counsel for the other official committees and the debtor to those of the Equity Committee. The bankruptcy court also appends a chart (Chart I) to the October 19 order demonstrating the comparable experience of the various counsel involved in the case.

In support of its conclusion concerning the quality of services performed by the Equity Committee's counsel, the bankruptcy court discusses counsel's work on two of the issues in the case, namely, the sale of the assets of Federal Wholesale Company, formerly a wholly-owned subsidiary of the debtor, and the responses to the motion of Pittsburgh National Bank for relief from the automatic stay to set off a deposit account.

Finally, the order of October 19 charges that the Equity Committee's counsel have requested excessive fees "for time not identified as to the work performed; time charged by firms for preparation of fee applications; and reimburseable expenses." A second chart (Chart II) is appended in support of these conclusions. The October 19 order cites no legal authority for the decision to deny the second retention motion.

On October 28, 1987, the bankruptcy court entered an order styled "ORDER MODIFYING ORDER OF OCTOBER 19, 1987 AND DENYING MOTION OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR STAY PENDING APPEAL." This order reviews the sequence of events which led to the October 19 order, concluding that the original retention motion failed to set forth facts demonstrating that the Equity Committee had met the requirements of 11 U.S.C. § 1103(a)[5] in selecting its counsel, and that the subsequent McCoy letter was not filed in accordance with Amended Administrative Order I. As a matter of law, the bankruptcy court concluded that notice and hearing were not required prior to ruling on an application for the employment of a professional by an official committee, citing *In re Massetti*, 60 B.R. 756 (Bankr, E.D.Pa.1986); *In re International Technical Products Corp.*, 58 B.R. 33 (Bankr.S.D.Fla.1986); and *In re Crest Mirror and Door Company, Inc.*, 57 B.R. 830 (Bankr.9th Cir.1986). Finally, the October 28 order directs the assistant United States Trustee for this district to meet with the members of the Equity Committee to advise them of law firms that he believes have the requisite professional skills who might be interested in representing the committee at lower rates of compensation.

### III. *The Equity Committee's Appeal*

In sum, the Equity Committee argues that the October 19 order is legally, factually and procedurally deficient, and that therefore it must be reversed by this court. According to the committee, the clear and intended effect of the October 19 order is to deny the committee, the official representative of thousands of Heck's public shareholders, the fundamental right to be represented by counsel of its choice and thereby to participate meaningfully in the reorganization of Heck's. Further, the Equity Committee argues that even if the findings and conclusions made by the bankruptcy court in its October 19 order were true, which it strenuously denies, those findings and conclusions are nevertheless insufficient as a matter of law to justify the dismissal of counsel. Finally, the committee asserts that the October 19 order is without basis in fact, arguing that it mischaracterizes the facts, ignores significant contributions to this case made by the Eq-

5. Title 11, United States Code, Section 1103(a) provides as follows:

   At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

uity Committee and its counsel, and wrongfully disparages counsel's conduct and competence.

Initially, it is observed that the Equity Committee had substantially complied with the requirements of 11 U.S.C. § 1103(a) before filing its original retention motion on April 24, 1987. That motion does not suggest that bankruptcy court approval was being sought on an interim basis. The lengthy motion, submitted by George A. Skouras of Citicorp in his capacity as a member of the Equity Committee, states that the committee has voted to retain BI & L as its lead counsel and McCoy as its local counsel, subject to the court's approval. It details counsel's experience in Chapter 11 cases, the professional services expected to be rendered, the expected responsibilities of lead and local counsel, respectively, and the normal hourly rates charged by each. The motion further states that BI & L and McCoy have not represented any other entity in connection with this matter, have no connection with the debtors, their creditors, other shareholders, or any other parties in interest, and that their employment is necessary and in the best interests of the Equity Committee. Attached as exhibits to the motion are biographical summaries for the various attorneys expected to perform significant work on the case, plus affidavits from Robert M. Miller of BI & L and Frances W. McCoy.

In the mistaken belief that the Equity Committee had not yet held the organizational meeting required by 11 U.S.C. § 1103(a), the bankruptcy court entered its order on May 1, 1987, approving "Interim"[6] employment of counsel, "pending the organizational meeting of such Committee." The court further ordered the committee to "notify the court, after its organizational meeting, of its intention regarding the final employment of counsel." The requisite notification was given in the McCoy letter of May 6, 1987, in which the court was advised that the Equity Committee had held its organizational meeting. Requests for clarification were also solicited in the event the bankruptcy court or clerk still had any questions with respect to the Equity Committee's selection of counsel.

From May 6 until August 26, 1987, neither the bankruptcy court nor any party to the action questioned the status of BI & L and McCoy as counsel to the Equity Committee. When the bankruptcy court then directed yet another meeting of the Equity Committee to select permanent counsel, the committee complied by holding a meeting on September 1 at which it unanimously reaffirmed the employment of BI & L and McCoy as lead and local counsel, respectively, and filed a second retention motion on that same date. Over one and one-half months later, without prior notice or hearing, the bankruptcy court entered its October 19 order denying the second retention motion and ordering that the "interim" appointment of BI & L would terminate on October 28, 1987.

It thus appears that for some six months BI & L and McCoy served as counsel for the Equity Committee with little question as to their status by the bankruptcy court. No party to this action has objected to their retention, and the bankruptcy court gave them no indication that it was contemplating their dismissal. Further, the bankruptcy court gave BI & L and McCoy no opportunity to address the allegations it made in its October 19 order.[7]

---

**6.** It is observed that neither the Bankruptcy Code nor the Bankruptcy Rules provide for "interim" appointment of counsel. Indeed, as the Equity Committee points out, to grant approval of an attorney's employment on a temporary basis and then allow the case to progress before making a final decision on employment could have a chilling effect on the zealousness of counsel's representation of his client.

**7.** The Equity Committee contends that procedural due process required that it be given notice and an opportunity to be heard prior to the bankruptcy court taking such drastic action in its October 19 order. It is well-settled that as a general principle, due process requirements apply to bankruptcy cases. *See In re Boomgarden,* 780 F.2d 657, 662 (7th Cir.1985); *In re Standard Metals Corp.,* 48 B.R. 778, 787 (Bankr.D.Colo. 1985), *aff'd on other grounds sub. nom., Sheffelman v. Standard Metals Corp.,* 817 F.2d 625 (10th Cir.1987); *In re John Clay & Co.,* 43 B.R. 797, 803–04 (Bankr.D.Utah 1985). *See also City of New York v. New York, New Haven & Hart-*

Under all the circumstances, it would be fundamentally unfair to the Equity Committee that it be denied the further use of its chosen counsel, BI & L and McCoy, in the absence of a showing of good cause for such unusual action. It has long been held that "[t]he relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously. Only in the rarest cases should the [client] be deprived of selecting his own counsel...." *Kanter v. Robertson*, 102 F.2d 92, 93 (4th Cir.1939). As stated in *Beck v. Board of Regents*, 568 F.Supp. 1107 (D.Kan.1983):

> The decision to disqualify an attorney chosen by a party to represent him in a lawsuit is of serious concern and the courts [sic] inherent power to do so should only be exercised where the integrity of the adversary process is threatened. Even then, the court should not act unless "the offending attorney's conduct threatens to 'taint the underlying trial' with a serious ethical violation." *Field v. Freedman*, 527 F.Supp. 935, 940 (D.Kan.1981).

568 F.Supp. at 1110. *See also Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576–77 (Fed.Cir.1984) ("[t]he right of a party to select counsel of his choice [is] a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety has occurred"). Indeed, even where professional conduct has been called into question, courts are "loathe to separate a client from his chosen attorney." *Shaw & Levine v.*

*Gulf & Western Industries, Inc. (In re Bohack Corp.)*, 607 F.2d 258, 263 (2d Cir. 1979).

Disqualification of an attorney is not lightly granted. The Second Circuit, in *Armstrong v. McAlprin*, 625 F.2d 433 (2d Cir.1980), identified only two circumstances in which disqualification will be ordered:

> [W]ith rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, ... or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage.... But in other kinds of cases, we have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct.... This reluctance probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons.... And even when made in the best of faith, such motions inevitably cause delay.

625 F.2d at 444, *quoting Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979) (citations and footnotes omitted).[8]

ford Railroad Co., 344 U.S. 293, 296–97, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *See also Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970). It is true that neither Section 1103(a) nor Rule 2014(a) specify a requirement of notice and hearing on applications for the employment of a professional by an official committee. Yet, the bankruptcy court had given tacit approval over

a period of several months to the retention of BI & L and McCoy by both the "Interim" order of employment and its failure to reject the McCoy letter as an adequate response to that order until August 26, 1987. Under the circumstances, the Equity Committee was plainly entitled to an opportunity to be heard before the court ordered termination of its chosen counsel.

**8.** *See also In re Macon Prestressed Concrete Co.*, 61 B.R. 375, 378 (Bankr.M.D.Ga.1986) ("ABA Code of Professional Responsibility ... governs the disqualification of attorneys in bankruptcy proceedings"); *In re Whitney-Forbes, Inc.*, 31 B.R. 836, 839 (Bankr.N.D.Ill.1983) ("the unnecessary disqualification of any attorney ... may unfairly deny to a litigant counsel of his choice,

Neither of the two grounds for disqualification identified in *Armstrong* is present here.

Moreover, in *In re W.T. Grant,* 4 B.R. 53 (Bankr.S.D.N.Y.1980), *aff'd on other grounds sub. nom., Cosaff v. Rodman,* 20 Bankr. 186 (S.D.N.Y.1982), *aff'd,* 699 F.2d 599 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), the court recognized as "a cardinal principle of bankruptcy administration that a trustee in bankruptcy is entitled to engage attorneys of his choice, subject only to the approval of the court.... [D]isqualification of ... attorneys requires considerable reluctance inasmuch as disqualification has an immediate adverse effect on the administration of a bankruptcy estate...." 4 Bankr. at 82. Indeed, the cases where motions for approval of counsel have been denied or counsel have been dismissed illustrate the extreme circumstances necessary to warrant such action. *See, e.g., In re Slack,* 73 B.R. 382, 386–87 (Bankr.W.D.Mo.1987) (denying retention where counsel repeatedly failed to attend scheduled hearings in other bankruptcy cases and failed to make timely and sufficient filings); *Curran v. Samdperil (In re New England Metal Co.),* 67 B.R. 53 (D.R.I.1986) (counsel for trustee repeatedly defied court's directions to pursue preference action and failed to prosecute other suits); *In re Rutherford,* 54 B.R. 784 (Bankr.W.D.Mo.1985) (counsel repeatedly failed to attend hearings or comply with court's orders, yet court nonetheless reinstated him as debtor's counsel inasmuch as prior disqualification order entered solely because court mistakenly believed counsel wished to withdraw; held, given counsel's desire to remain in case, only appropriate remedy was reduction in fees).

■ The only statutory limit on an official committee's fundamental right to select counsel of its choice is contained in Section 1103(b) of the Bankruptcy Code, which provides as follows:

(b) An attorney or accountant employed to represent a committee appointed un-der section 1102 of this title [11 USCS § 1102] may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

The purpose of this section is to prevent conflicts of interest. *In re Lion Capitol Group,* 44 B.R. 684, 687 (Bankr.S.D.N.Y. 1984); *In re Saxon Industries, Inc.,* 29 B.R. 320, 321 (S.D.N.Y.1983). As the court stated in *In re Lion Capitol Group,*

It thus appears from the legislative history, from prior authority in this Court and from the amendment to § 1103(b), that Congress intended substance to prevail over form. Where the representation does not entail an actual or potential conflict of interests or present an appearance of impropriety, § 1103(b) is not to be interpreted to preclude a committee from engaging counsel of its choice and one in whom it has confidence will best serve the interests of the creditors represented by the Committee.

44 B.R. at 689.

The reasons stated in the October 19 order for terminating the employment of counsel for the Equity Committee can be categorized as follows: (1) the management, work assignments and billing of lead and local counsel are inconsistent with Amended Administrative Order III and 11 U.S.C. § 330; (2) their requests for compensation fail to adhere to the standards set forth in the Bankruptcy Code and the bankruptcy court's administrative orders; and (3) the quality of the work performed is poor.

Initially, it is observed that the bankruptcy court states that though counsel for the Bank and Trade Committees have "considerably more experience" than counsel for the Equity Committee, the Bank and Trade

---

thereby contributing to public suspicion of the bar and judiciary"); *In re Allied Artists Pictures Corp.,* 17 B.R. 288, 290 (Bankr.S.D.N.Y.1982)

(disqualification will be ordered only under the two circumstances identified in *Armstrong* ).

Committee counsel are representing their clients with greater economy to the estate.

To support its statement regarding counsel's experience, the bankruptcy court attaches "Chart I" to its order of October 19. This chart lists the billing rate, years of experience, and "noteworthy bankruptcy experience" for each attorney for the Trade, Bank and Equity Committees, respectively. While Mr. Miller as lead counsel for the Equity Committee has fewer years of experience than lead counsel for the other committees due to his relatively young age of 36 years, the quality of his bankruptcy experience and that of his firm is impressive. Under the heading "noteworthy bankruptcy experience," Chart I lists Mr. Miller as a member of the Business Bankruptcy Committee of the American Bar Association's Section of Corporation, Banking and Business Law and credits him with having co-authored articles for the Chapter 11 Reporter on Bankruptcy Securities. The chart fails to note that BI & L and Mr. Miller appear to have wide and extensive experience in bankruptcy matters. Mr. Miller co-manages BI & L's bankruptcy department with David Strumwasser. Appellant's brief on appeal, pp. 24–26.[9] The firm has represented, or currently represents, official committees of creditors or equity holders in several Chapter 11 cases involving large corporations, including A.H. Robins Co., Inc. (E.D.Va.), Texscan Corp. (D.Ariz.), Beker Industries Corp. (S.D.N.Y.), Continental Airlines (S.D. Tex.), Revere Copper & Brass (S.D.N.Y.),

Anglo Energy Limited (S.D.N.Y.), Nexus Industries, Inc. (N.D.Ind.), Salant Corp. (S.D.N.Y.), and Todd Shipyards (D.N.J.). In each case, BI & L's retention has been approved without question, and in three cases (Salant, Revere Copper & Brass, and Continental Airlines), the firm was awarded premium compensation in excess of its customary rates to reflect extraordinary results and quality of representation. Mr. Miller has served or currently serves as lead counsel to the Equity Committee in four of those cases, including A.H. Robins, Baker Industries, Revere Copper & Brass, and Salant. BI & L also represents or has represented groups of major creditors, equity holders, individuals or other parties in interest in several other large, complex Chapter 11 cases [10] and has experience in out-of-court workouts.[11] From all that is before the court, lead counsel for the Equity Committee appears to enjoy as much quality bankruptcy experience as that of lead counsel for the other committees.[12]

To support its statement that counsel for the other committees are representing their clients with greater economy to the estate, the bankruptcy court compares average hourly billing rates through July, 1987, as follows:

| Counsel for: | Average $/Hr. | % of Debtor's Rate |
|---|---|---|
| Debtor | $ 111.46 | NA |
| Bank Committee | 111.60 | 100 |
| Trade Committee | 130.34 | 117 |

9. Mr. Miller has participated as a speaker in various bankruptcy seminars, including a series of seminars conducted nationwide by Institutional Investor Magazine relating to bankruptcy matters, and, together with Mr. Strumwasser, has co-authored the series of articles in The Chapter 11 Reporter already noted. Mr. Miller has also testified before several state utility rate-making commissions regarding the implications of a utility bankruptcy.

10. BI & L also represents or has represented individual or groups of major creditors, equity holders or other parties in interest in the following large, complex Chapter 11 cases: Buttes Gas & Oil Corp., The Charter Company, Cook United, Inc., Eastmet Corporation, Lionel Corporation, Macrodyne Industries, Inc., Manville Corporation, MGF Oil Corp., O.P.M. Leasing Services, Pizza Time Theatre, and Texaco, Inc.

11. For example, in July of 1987, BI & L completed a successful out-of-court restructuring as counsel for Dart Drug Stores, Inc. Also in July, 1987, BI & L completed a successful out-of-court restructuring of Crime Control, Inc., as counsel for the majority of public debentureholders.

12. Local counsel for the Equity Committee, while not possessing lead counsel's extensive and nationwide experience, is not new to bankruptcy matters inasmuch as she served as a law clerk to the United States Bankruptcy Court for the Southern District of West Virginia for two years. Since leaving that position, she has been involved in several Chapter 11 cases in both the Northern and Southern Districts of West Virginia.

| Counsel for: | Average $/Hr. | % of Debtor's Rate |
|---|---|---|
| Equity Committee | $ 152.78 | 137 |

As of the period ending July 31, 1987, the total fees and expenses billed to the estate by each committee's counsel were:

| Equity Committee | 271,474 |
| Bank Committee | 158,216 |
| Trade Committee | 246,291 |

Order of October 19, 1987, p. 6.

Though New York-based BI & L's hourly rates predictably are higher than those of Charleston-based law firms, they are not higher than rates charged by other New York professionals in the case.[13] Moreover, when paraprofessional time and charges are included in blended hourly rate calculations, the blended hourly rates of counsel for the Equity Committee are not significantly different from those of other out-of-town counsel.[14] Additionally, total billings for fees and expenses for the same four months ending July 31, 1987, by the Equity Committee's counsel ($271,474) are just 10.2% greater than the total billings of the Trade Committee's counsel ($246,291) for the same period. That is not to say that the Equity Committee's request is fair and reasonable, but only that the totals are nearly in line with those of the Trade Committee.

The bankruptcy court also found that the management, work assignments and billing of counsel for the Equity Committee were inconsistent with Amended Administrative Order III(B) and 11 U.S.C. § 330. Amended Administrative Order III(B) provides as follows:

*Allocation of Work.* Supervising attorneys and managing professionals shall strictly adhere to 11 U.S.C. § 330 in determining the allocation of work to be performed by their firms and shall exercise control over time spent by associates and paralegals on research, revision, and editing. Work shall be assigned to available professionals so as to obtain reliable results in the most economical fashion possible. Supervising attorneys and managing professionals shall certify that each function for which compensation is sought has been performed by the most suitable available professional or support person, measured by a balance of needed expertise in the subject area and the hourly billing rate of available persons.

Furthermore, 11 U.S.C. § 330 provides in pertinent part that "the court may award ... reasonable compensation for actual, necessary services." Additionally, 11 U.S.C. § 330 specifies that the value of such services, time spent on such services, and the cost of comparable services should be considered in determining the compensation allowed.

Equity Committee counsel's billings have been discussed above. Regarding management and work assignments, the Equity Committee's brief includes a chart which summarizes the proportionate use of partners, associates and paraprofessionals by lead and local counsel for all committees through September 30, 1987:

| Lead Counsel: | Partners Time | Associates Time | Paraprofessionals Time |
|---|---|---|---|
| Equity Committee | 25.1% | 50.3% | 24.6% |
| Bank Committee | 29.1% | 53.2% | 17.2% |

**13.** According to BI & L's brief on appeal, New York counsel in this case set forth their normal charges as follows: Robert Miller, a BI & L partner and lead counsel for the Equity Committee, $240 per hour, and Arlene Koval, a BI & L associate, $130 per hour; Otterbourg, Steindler, Houston and Rosen, P.C., lead counsel to the Trade Committee, $225 per hour for the partner assigned to the case and $135 per hour for a fourth-year associate; Reavis & McGrath, Heck's New York securities counsel, $305 and $285 per hour for its securities and bankruptcy partners, respectively, and $190 per hour for a senior associate. After BI & L filed its application for fees and expenses as noted in the text above for the period ending July 31, 1987, the bankruptcy court ordered BI & L fees limited to $200 per hour and has since imposed the same limitation on other New York counsel.

**14.** The bankruptcy court used only attorney charges in calculating its average hourly charge. *See* Brief of the Equity Committee, Appendix III.

| | Partners Time | Associates Time | Paraprofessionals Time |
|---|---|---|---|
| Trade Committee | 38.0% | 62.0% | 0% |
| Local Counsel: | | | |
| Equity Committee | 70.4% | 0% | 29.6% |
| Bank Committee | 41.6% | .2% | 58.2% |
| Trade Committee | 47.6% | 33.7% | 18.7% |

It thus appears that BI & L's management and work assignments from an internal economical standpoint compare favorably with those of other lead counsel in the case but unfavorably as between local counsel.[15] Again, that is not to say that any of the committees has achieved the most desirable and economical arrangement for management and assignment of work but that, based on the available figures, Equity Committee counsel's percentages are, on balance, comparable to those of the Trade and Bank Committees.

The order of October 19 further states that Equity Committee counsel's requests for compensation fail to adhere to the standards set forth in the Bankruptcy Code and the bankruptcy court's administrative orders. In particular, the bankruptcy court cites three problem areas: charges billed for time not identified as to work performed, time charged for preparation of fee applications, and reimbursable expenses. Order of October 19, p. 17, Chart II. To the extent that a given request fails to meet applicable standards, the bankruptcy court is empowered to deny or reduce that request as may be appropriate. It is observed that with each fee application, Equity Committee counsel has included a daily statement detailing who worked on the case, what that person did, and the amount of time expended thereon. The applications also include a summary statement of who worked on the case during the relevant time period, their customary billing rates, the total hours spent on the case, and the total fee requested. By and large, the fee applications contain "sufficient description of the work performed to permit reviewing parties to make an intelligent judgment as to what was done and the reasonableness of the amount of time required to do it." Amended Administrative Order III, ¶ IV.E.[16] Moreover, Heck's fee application auditor has not found the descriptions of services performed and time spent to be inadequate. Indeed, for whatever it may be worth, the fee auditor found that the applications were prepared in accordance with Amended Administrative Order III, with the exception that counsel billed more for in-house copying than would be charged by outside copying services.

15. The October 19 order also makes reference to the fact that McCoy, the Equity Committee's local counsel, has done little of the committee's research and drafting of pleadings. Ms. McCoy is a sole practitioner. The Equity Committee states that by the time its members were appointed, most, if not all, larger bankruptcy firms in Charleston were retained or had conflicts precluding their representation of the Committee. The Committee selected McCoy based on her expertise in bankruptcy matters and local bankruptcy procedures. It was apparent, yet unavoidable, that McCoy, although well-qualified to perform some of the legal research and drafting, would be unable to do so by virtue of the nature of her practice. Instead, most of the research and drafting has been done by a BI & L junior associate under Mr. Miller's supervision.

16. Amended Administrative Order III, ¶ IV.E, provides as follows:

*Fees.* All professionals who seek compensation for professional efforts expended in this case shall itemize by date, to the nearest quarter-hour segment, the time for which they seek payment with sufficient description of the work performed to permit reviewing parties to make an intelligent judgment as to what was done and the reasonableness of the amount of time required to do it.

The bankruptcy court further notes that an addendum to this Amended Administrative Order was issued on June 10, 1987. This addendum provides in paragraph VII.A. that "[d]ocumentation may be itemized by blocks of time, provided that the description of services is adequate to allow reviewing parties to evaluate, value and extent of the services rendered."

Regarding time charged for preparation of fee applications, Amended Administrative Order III, ¶ V.G., as amended April 28, 1987, permits time to be billed for preparation of fee applications so long as the time is reasonable and necessary. Chart II attached to the October 19 order indicates that during the period from June 1 to July 31, 1987, counsel for the Equity Committee billed substantially more for fee application preparation than did other counsel in the action. BI & L states by way of explanation that it has been forced to spend more time preparing its fee applications because the bankruptcy court has subjected them to more careful scrutiny relative to fee applications of other counsel. In recognition of this, BI & L advises that it has voluntarily reduced its billings for fee-related matters by 20%. Whether BI & L's charges for fee application preparation are "reasonable and necessary" is a determination best left to the bankruptcy court. If that court finds such charges to be unreasonable or unnecessary, it may simply reduce the amount it allows counsel for those items.

Regarding charges for expenses, Chart II indicates that BI & L requested much more for these items than did other counsel for the period from June 1 to July 31, 1987. BI & L states that its fee applications for that period were filed prior to the bankruptcy court's order of August 11, 1987, allowing interim compensation for professionals who filed fee applications heard on May 27 and July 1, 1987. According to BI & L, this order afforded the parties, for the first time, the bankruptcy court's interpretation of its administrative orders with respect to reimbursable expenses. Prior to entry of this order, BI & L states that it only sought reimbursements for those expenses customarily charged to its clients which were not specifically precluded by the then-existent administrative orders. BI & L further states that its fourth fee application, submitted after it had the opportunity to review the August 11 order, did not seek reimbursement for expenses which the bankruptcy court indicated in its August 11 order were not reimbursable, such

as local transportation and typing. It thus appears that the large expense reimbursement request by BI & L reflected in Chart II may result from a misunderstanding that it has undertaken to correct.[17]

In support of its finding that Equity Committee counsel had billed excessively for poor quality work, the bankruptcy court set forth its evaluation of counsel's services respecting two issues: the sale of Federal Wholesale Company, a wholly-owned subsidiary of Heck's, Inc., and the motion of Pittsburgh National Bank for stay relief in order to setoff a deposit account held by Heck's.

As to the sale of Federal Wholesale, a matter heard on appeal by this court, the bankruptcy court noted in its order terminating BI & L:

> In connection with the sale of Federal's assets, B,I & L billed the Debtor's estate for more than 130 hours at a cost of over $21,000.00 for posttrial pleadings citing nonexistent facts and inapplicable law.

When this court at a hearing on October 28, 1987, granted BI & L a stay pending appeal of the bankruptcy court's order terminating BI & L as counsel for the Equity Committee, the undersigned judge made the following comments which serve to support the bankruptcy court's finding respecting Federal Wholesale:

> I want to make this further observation. The bankruptcy court has I believe as its basic concern in this matter that the attorney fees in the Heck's proceeding remain at a reasonable level. That plainly is a laudatory goal. I want to note also to the Equity Security Holders Committee that it is your duty to see to it insofar as you can that the costs which you incur, whether for counsel or otherwise, are held to the minimum level consonant with the fair representation of the committee and the appropriate investigation that must take place in order to assure the shareholders that they will be treated fairly. At the same time, it is

17. Whether these and other contentions by BI & L are accurately stated could have been tested

had the Equity Committee been accorded an opportunity to be heard.

the duty of counsel for the committee to inform the Equity Security Holders Committee of the frailty of its position when the Equity Security Holders Committee is suggesting that a particular course of action be followed. I point that out at this stage because it was my belief when the appeal was filed in the Federal Wholesale matter, it was simply meritless. It is up to counsel to inform the Security Holders Committee that it has no case when it has no case. And it is up to the Security Holders Committee to act on that advice rationally. I don't suggest that the Equity Security Holders Committee should not have pursued the matter before the bankruptcy court. I do suggest that the appeal should not have been pursued because it simply didn't have any basis.

I mention that in particular because it is important that fees be held, as I have earlier stated, to a reasonable level. The bankruptcy court ought not to be put to the onerous and burdensome duty of feeling the need to scrutinize every entry in an application for fee because it has found the fee to be the subject of an excessive request in one or more instances. Counsel have a great deal to do with relieving the court of that necessity by limiting the work that is done to that which is reasonably necessary and undertaking to limit the fees themselves for that work to that which is reasonable compensation.

Transcript of October 28, 1987, pp. 53–55.

Regarding the Pittsburgh National Bank setoff motion, the October 19 order focuses on two criticisms: the Equity Committee's response to the motion contained only two and one-half pages discussing case law, and the amount of time spent researching and drafting the response appeared excessive. In response, BI & L states that it researched all legal issues relevant to the matter, including the nature of the deposit account, mutuality of debts, and Pennsylvania state law on setoff. This research disclosed that those issues had been fully researched and adequately presented by Heck's and the Trade Committee, and thus in the interests of economy BI & L elected to submit a short response which incorporated by reference the other responses and focused on issues which were not more fully addressed by Heck's and the Trade Committee, to-wit, (1) that to the extent Pittsburgh National Bank had a right of setoff, that right was exercised when Pittsburgh National Bank honored certain letters of credit and debited Heck's account, and (2) an expanded discussion of why Pittsburgh National Bank was not entitled to adequate protection. The bankruptcy court found that BI & L billed more than 56 hours and nearly $8,000.00 for work on the Equity Committee's response to the Pittsburgh National Bank setoff motion. The bankruptcy court further noted the greater contribution made by counsel for the other committees at lesser cost with respect to the Pittsburgh National Bank dispute. Without undertaking at this stage to rule upon the request of Equity Committee counsel for payment for its services with respect to the Pittsburgh National Bank matter, it would appear that there is substantial basis for the bankruptcy court's findings on that issue.

Indeed, both the Federal Wholesale and Pittsburgh National Bank matters illustrate a fundamental problem that must be addressed in the underlying Heck's Chapter 11 case in order to assure that counsel for the Equity Committee, as well as counsel for the debtor and the other committees, do not again unnecessarily duplicate work where all of those entities, or at least some of them, have a common goal and parallel interests in the resolution of a given dispute. In the Pittsburgh National matter, it seems that the debtor and the Trade and Equity Committees sought the same result. In Federal Wholesale, the debtor and the Trade and Bank Committees concluded that the sale was in their best interests. It would appear to have been a waste of precious assets of the debtor for three of these entities to have researched, briefed and argued the same basic positions in each Pittsburgh National and Federal Wholesale. When common interests exist, common sense dictates that lead counsel be designated, whether by the parties or the court, to pursue the matters without the intense involvement of every

other concerned party in the case. This court routinely requires multiple plaintiffs and defendants in civil litigation having a common interest in a given matter to designate lead counsel to handle issues on which they are in agreement. The same approach is encouraged in criminal trials involving multiple defendants to the extent the interests are common. There is no reason that the same avenue should not be vigorously pursued in the Heck's Chapter 11 case to the extent conflicting interests are absent.

### IV. *Conclusion*

Only in extraordinary instances may the client be deprived of the privilege of selecting and continuing with his own counsel. As the case law makes quite plain, this rule applies in bankruptcy cases as in other legal proceedings. To the extent that counsel for the Equity Committee is appropriately found to have made impermissible charges, those matters are properly addressed at this stage not by rejecting competent counsel of the committee's choice, but by disallowing unnecessary, improper and excessive requests for compensation and expenses. That is not to suggest that repeated requests for excessive compensation and allowances of expenses would never result in removal of counsel for cause shown after due notice and hearing. The court's patience is not inexhaustible and the court's time for devotion to collateral matters such as allowance of fees and expenses is not unlimited.[18] In the meantime, the Equity Committee is entitled to be represented by counsel of its choice.[19]

Accordingly, it is ORDERED that the orders on appeal entered by the bankruptcy court on October 19, 1987, and October 28, 1987, be, and they hereby are, reversed.

---

18. At the same time, it is apparent that fees and expenses will necessarily be incurred in substantial amounts regardless of who represents the shareholders, just as will be the case for the debtor and the other committees.

19. Equity Committee counsel notes that it has made significant contributions to this action not reflected in the October 19 order. Equity Committee counsel filed two motions seeking authority to commence investigations under Bankruptcy Rule 2004 of Heck's institutional lenders and with respect to prior accounting practices and irregularities at Heck's, in the belief that such investigations will provide crucial information necessary for formulating a plan of reorganization and determining the claims of such lenders, and may also give rise to separate recoveries for the Heck's estate and shareholders.